UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KENNETH HARVEY,

        Petitioner,

  vs.

D. K. SISTO, Warden,

        Respondent.
                           /

No. C 07-4229 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

        This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with the court. Petitioner has responded with a traverse. For the reasons set out below, the petition is denied.

**BACKGROUND**

        Petitioner was convicted by a jury of first degree murder and use of a firearm. He was sentenced to prison to an indeterminate term of twenty-five years to life for murder and to a consecutive twenty-five years to life term for firearm use, plus two years for prior prison terms. Petitioner appealed his conviction in the California Court of Appeal, raising three issues, only one of which is repeated here. His conviction and sentence were affirmed on appeal and the Supreme Court of California subsequently denied review. Petitioner has also filed several unsuccessful state habeas petitions.

        He does not dispute the following facts, which are excerpted from the opinion of the California Court of Appeal.

///

James Birden was killed during a robbery of his residence, where he sold heroin. The prosecution theorized that while other accomplices may have participated in the robbery, defendant fired the fatal shots.

Birden lived in a detached unit behind a private residence on Foster Street in Oakland. Birden's unit, which had a single door, was accessible by a pathway adjacent to the front residence occupied by Ray Blackwell and his relatives. On September 15, 2000, around 2:00 p.m., when Ray arrived home, he saw Michael Enoch sitting on the hood of a car, looking down the pathway at Birden's unit. More than an hour later the car remained, but Enoch was gone. Around 3:45 p.m., Ray was outside when he heard three gunshots in rapid succession coming from Birden's unit. Ray's brother Greg, who was inside, also heard the shots.

Ray walked to the pathway and spoke to Greg, who was looking out the door toward Birden's unit. At that moment Jovett Jones arrived and walked to the screen door of Birden's unit. Ray and Greg saw her peer in, throw her hands up and back away. She returned to her car and left.

Ray testified that moments later, defendant came out of the unit holding a black 12 to 13-inch gun. Ray was able to see defendant's profile before defendant pulled his black windbreaker over his head. Ray did not know defendant, but had recently seen him in the neighborhood. Although Greg knew defendant, he was unable to see the man's face before he covered his head. Greg did note that the man's height and weight matched those of defendant. Defendant put the gun in the back of his pants, turned and climbed over the fence into the backyard of the house on Ghormley Avenue. At that point, Greg and Ray could no longer see defendant. Greg yelled that defendant shot Birden. No one else came out of Birden's unit. Ray told his brother to call 911 and got in his car to follow defendant.

Jovett Jones testified that as she knocked at Birden's door, she heard one person walking inside and the sound of furniture being moved. A man then stepped out of the house, holding a gun. She saw his face before he pulled a windbreaker over his head, but could not identify him. He was not bleeding and did not appear injured. The man turned to the left and climbed over the back fence. Jones ran to her friend's car and drove away.

Kay Alexander lived on Ghormley Avenue, behind Birden's unit. After hearing gunshots, she walked to her back door and saw a man come out of Birden's unit. She could see him from the waist up. Someone yelled that he had a gun. The man turned to his left and walked toward the fence. When she saw defendant at the top of the fence, he had pulled his dark windbreaker over his head and had a gun in his hand. He dropped into her neighbor's yard and walked to Ghormely Avenue. Alexander looked out her front window and saw defendant near her car. He straightened his windbreaker, put the gun in his waistband and walked away quickly. He did not appear injured and she saw no blood. Alexander stepped outside as Ray drove by. Alexander pointed out defendant's direction of travel.

Ray saw defendant, who no longer had the windbreaker over his face, talking to Gay Walker. Ray stopped his car, got out and yelled that defendant had just shot Birden. Walker backed away from defendant and Ray returned to his home.

     Defendant approached Kevin Marshall, an acquaintance who lived in the neighborhood, and asked for a ride. Defendant got in the back seat of Marshall's car and told him to "just drive." When defendant lay down on the floorboard, Marshall became suspicious, stopped the car and told defendant to get out.

     Ray and Greg found Birden lying face down on the floor with his hands outstretched. He was not breathing. There was tape on Birden's hands and around his head, covering his mouth to the tip of his nose. The lamps and chair were overturned in the bedroom and a large hole had been knocked in the wall. There was blood on the mattress, refrigerator and doorframe.

     When the police arrived at Birden's unit, they found evidence of heroin sales, but no drugs or money. Birden's wallet was empty, and its contents scattered on the kitchen counter. Drawers were open, and the mattress and cushions askew. An officer noticed a hole that had been cut in the bedroom ceiling and covered. Further investigation revealed that the space above this opening was empty.

     On the day of the incident, Ray was shown a photo lineup and identified defendant as the man he saw leaving Birden's unit. Alexander did the same three days later.

     Birden died of multiple gunshot wounds, including a bullet that pierced his heart. He also suffered stab wounds and blunt trauma to his face. Two 9-millimeter bullet fragments were recovered, one from the victim's body and another from behind a door. These fragments matched live rounds and casings found at the scene. Defendant's fingerprints, as well as those of Ronald Johnson, were recovered from a piece of tape on the coffee table. Defendant's fingerprints were also found on a roll of tape left on Birden's bed. Fingerprints of defendant and Greg Colbert were recovered from the car on which Enoch had been sitting.

     Police knew that Colbert and Enoch were associated with defendant. When they learned Colbert was staying at his ex-girlfriend's house, they searched the residence with her permission. They recovered Birden's keys from under a sofa cushion, a 9-millimeter pistol and .45-caliber ammunition. The .45-caliber ammunition was the same brand as that found in Birden's house. The pistol was not the murder weapon.

     Later that night, police saw defendant and Colbert return to the house. When an officer shined a flashlight into the window, defendant reached behind his back and walked backwards toward the bedroom. Police entered and arrested defendant. They then recovered a loaded .357-caliber revolver in the master bedroom and a loaded .45-caliber pistol from another bedroom. Defendant had a .357-caliber shell casing in his pocket. Greg identified the .45-caliber pistol as Birden's gun. It fit a shoulder holster found in Birden's unit.

     Defendant testified that he was using heroin on September 15, 2000. He went to Birden's house around noon to borrow money and get heroin. He had known Birden for at least twenty years and was a regular customer. Birden had no money, but was expecting a cash delivery shortly. Defendant waited with him and snorted heroin. Defendant later went into Birden's bathroom to use more heroin and may have fallen asleep. He heard voices in

> the living room that he did not recognize. Two armed men wearing ski masks and hats entered the bathroom, told him to get down and hit him on the head with guns until he lost consciousness. When defendant awoke, he was lying next to Birden in the living room. Birden was sitting on the floor with his back against the coffee table. His mouth was taped, but he was alive and uninjured. When defendant reached up to remove the tape, the masked men came from the bedroom toward him. Defendant ran out the door and climbed a fence directly in front of Birden's unit, which led to the adjacent yard on Foster Street. He continued jumping fences along Foster Street until he reached the end of the block. He saw Gay Walker and others whom he asked for a ride to a relative's home.
>
> Defendant denied touching the roll of tape in Birden's unit. He did not jump the fence into the yard on Ghormley Avenue and was never on that particular street. He said he wore a white sweatshirt, not a dark windbreaker; he did not cover his head as he left; and did not have a gun. As to the witnesses who described the man leaving Birden's unit, defendant testified, "They didn't see me. They seen someone else." Defendant testified he was like an uncle to Colbert. He was a friend of Enoch, whom Ray had seen at the car, and Ronald Johnson, whose fingerprints were on the tape on the coffee table.
>
> The jury convicted defendant of first degree murder and possession of a gun by an ex-felon, and found true the firearm use enhancement. The trial court found his two prior prison allegations proven. The court sentenced defendant to 25 years to life for murder with a consecutive 25 years to life for the firearm use, plus two years for the prior prison terms. A three-year term for gun possession was imposed concurrently.

Ex. C-4 (Unpublished Opinion of the California Court of Appeal, First Appellate District, *People v. Harvey*, No. A104279 (June 24, 2005)) at 1-3 (footnote omitted).

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

4

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.2000).

**DISCUSSION**

As grounds for habeas relief, petitioner asserts that: (1) his rights to due process and notice were violated when the prosecutor proceeded on a felony-murder theory; (2) the court violated his due process rights by instructing the jury on robbery and aiding and abetting; (3) the evidence was insufficient to support his conviction; (4) his counsel was ineffective at trial; (5) his right to effective assistance of counsel was violated when the trial court would not appoint substitute counsel to file a motion for a new trial; and (6) the prosecutor committed misconduct by making false statements.

5

**I.     Felony Murder**

Petitioner contends that he was not charged with felony murder, so his conviction of that offense violated his due process rights and his Sixth Amendment right to adequate notice of the charges against him.

Under California law, murder is a crime that can be established under a variety of theories, for instance felony murder or malice murder. *People v. Hughes*, 27 Cal. 4th 287, 369 (2002). In charging a defendant with murder, California law does not require that the prosecution include in the charging document the theory on which it will rely. *Id.* Also, it is not necessary under California law to charge a defendant separately with the underlying felony in order for a felony-murder conviction to obtain. *See People v. Johnson*, 233 Cal. App.3d 425 (1961). California courts also have held that when murder is charged, a jury instruction on first degree felony murder does not violate due process. *See, e.g., Hughes,* 27 Cal. 4th at 370.

The Sixth Amendment guarantees a criminal defendant a fundamental right to be clearly informed of the nature and the cause of the charges against him or her. *Calderon v. Prunty*, 59 F.3d 1005, 1009 (9th Cir. 1995); *Nevius v. Sumner*, 852 F.2d 463, 471 (9th Cir. 1988). This guarantee applies to the states through the Due Process Clause of the Fourteenth Amendment. *Gautt v. Lewis*, 489 F.3d 993, 1003 (9th Cir. 2007) (citing *Cole v. Arksansas*, 333 U.S. 196, 201 (1948)). However, the charging document is not the only possible source of notice of the charges; "a court can examine sources other than the information for evidence that the defendant did receive adequate notice." *Gautt v. Lewis*, 489 F.3d, 1003 (9th Cir. 2007); *see Murtishaw v. Woodford*, 255 F.3d 926, 953-54 (9th Cir.2001) (relying on the state's opening statement, evidence presented at trial, and the instructions conference to hold that the defendant had notice of the prosecution's felony-murder theory).

Here, much of the evidence at trial focused on robbery. *See Morrison v. Estelle* 981 F.2d 425 (9th Cir. 1992) (holding that constitutionally adequate notice of a felony-murder theory is provided by evidence of the underlying felony presented at trial, even where the

underlying felony is not charged ).  In addition to the evidence at trial that provided notice of a robbery-murder theory, the district attorney explicitly stated that robbery-murder was the people's theory during the July 28, 2003, pretrial conference, when petitioner and defense counsel were present in open court.  The district attorney stated, "[a]s the court knows, the defense counsel knows, the people's theory is that this was a murder committed during the commission of a robbery or an attempted robbery."  Ex. B-6 at 75.  This statement – particularly in combination with the evidence of robbery that was presented at trial – gave petitioner adequate notice that he would have to defend against a felony-murder theory of the case.  There was no due process or Sixth Amendment Notice Clause violation.

## II.  Jury Instruction on Robbery and Aiding and Abetting

Petitioner asserts that his due process rights were violated when the court instructed on robbery and aiding and abetting.  In the petition he says only that his rights "were violated when the trial court instructed the jury on robbery, court committed error in jury instructions."  The facts he alleges in support of this are:  "On August 14th, 2003, the trial court instructed the jury on robbery and on aiding and abet[t]ing.  [S]ee attached papers."  Of the "attached papers," only copies of some jury instructions regarding robbery relate to this claim, which does not help explain the grounds for petitioner's claim.

An application for a federal writ of habeas corpus filed by a prisoner who is in state custody pursuant to a judgment of a state court must "specify all the grounds for relief which are available to the petitioner . . . and shall set forth in summary form the facts supporting each of the grounds thus specified."  Rule 2(c) of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.  "'[N]otice' pleading is not sufficient, for the petition is expected to state facts that point to a 'real possibility of constitutional error.'"  Rule 4 Advisory Committee Notes (quoting *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1970).  "Habeas petitions which appear on their face to be legally insufficient are subject to summary dismissal."  *Calderon v. United States Dist. Court (Nicolaus)*, 98 F.3d 1102, 1108 (9th Cir. 1996) (Schroeder, J., concurring).

The only facts petitioner has alleged are that the court instructed on robbery and

7

aiding and abetting. These facts obviously do not point to a real possibility of constitutional error. This claim will be rejected for that reason.

### III.   Insufficient Evidence Claim

Petitioner claims that the evidence at trial was insufficient to support his conviction.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim. *Jackson v. Virginia*, 443 U.S. 307, 321 (1979). If proven, this entitles him to federal habeas relief. *Id.* at 324; *see, e.g., Brown v. Farwell*, 525 F.3d 787, 797-98 (9th Cir. 2008). The same standard applies under California law. *People v. Johnson*, 26 Cal.3d 557, 575-78 (1980).

Petitioner was identified by two witnesses as the armed man seen leaving the victim's house immediately after gunshots were heard, and his fingerprints were found on a roll of the tape that was used to bind the victim. This was substantial evidence to support the conviction.

### IV.   Ineffective Assistance of Counsel

Petitioner raises as two separate issues contentions (1) that his counsel was ineffective at trial; and (2) that the trial court violated his rights by denying his motion for substitution of counsel without adequate inquiry. There is, however, no Constitutional right to any particular form of inquiry when a motion for substitution of counsel is made. The only constitutional right involved when a defendant asks for new counsel is the right to effective assistance of counsel. *Bland v. California Dep't of Corrections*, 20 F.3d 1469, 1475 (9th Cir. 1994), *overruled on other grounds by Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000) (en banc). The ultimate inquiry in a federal habeas proceeding is whether the petitioner's Sixth Amendment right to counsel was violated. *Cf. Schell v. Witek*, 218 F.3d 1017, 1024-25 (overruling earlier circuit precedent that had stated that habeas court's

inquiry was whether the state court's denial of the motion was an abuse of discretion).  That is, the habeas court considers whether the trial court's actions resulted in a denial of effective assistance of counsel, and as a result, "actually violated [petitioner's] constitutional rights."  *Id.* at 1026.

The only question before this court, therefore, is the constitutional one of whether counsel was ineffective, not whether the trial court's hearing on the motion for new counsel was thorough or whether its ruling was based on a correct understanding of the facts.  *See id.* at 1017, 1024-25.  As a result, petitioner's claims that the trial court's inquiry was not adequate and that the denial of his motion for new counsel in itself violated his rights are without merit, and will be denied.  His claims of ineffective assistance, whether mentioned in issue five (denial of motion for substitute counsel) or issue four (ineffective assistance) are discussed below.

### A.  Standard

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  *Id.*  The right to effective assistance of counsel applies to the performance of both retained and appointed counsel without distinction.  *See Cuyler v. Sullivan*, 446 U.S. 335, 344-45 (1980).

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  *Strickland*, 466 U.S. at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is a probability sufficient to

undermine confidence in the outcome. *Id.* Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689.

### B.     Analysis

The instances of ineffective assistance alleged by petitioner, combining the allegations in claims four and five, are that counsel did not: (1) adequately investigate the case; (2) adequately prepare him to testify; (3) impeach the prosecution's main witnesses with prior inconsistent statements; (4) file motions to challenge his warrantless arrest and the search of the Pittsburg residence; and (5) present a constitutionally-sufficient closing argument.

There is no evidentiary basis for the first two claims, which therefore will be summarily denied.

### 1.     Failure to Impeach Witnesses

Petitioner claims his counsel was ineffective because he failed to draw attention to alleged inconsistencies in the testimony of the prosecution's main witnesses, Kay Alexander and Ray Blackwell, the only two who identified petitioner. Although petitioner refers to "inconsistencies" between the statements these witnesses made to police and those they made to the court, the only specific complaint he mentions, and that only in the traverse, is that Alexander allegedly told the police that the suspect was "four foot tall." Trav. at 29. Presumably the implication is that petitioner is not four feet tall, and that counsel could have impeached Alexander with her statement to police saying that the perpetrator was that height.

Counsel did attempt to use the height issue. On cross-examination, he asked: Did you give an original description to the police in a taped statement or ..." Ex. B-11, vol. 5 at 760-61. After the witness answered: "Yes, I did," counsel asked: "And how big did you say the person was that you saw over at the other house?" The answer was: "I didn't." Counsel asked: "Did you describe the height of the person?," to which the witness answered: "I didn't describe a height." Counsel: "At all?" Witness: "No." Counsel: "You

didn't say ...." Witness: "I don't recall." Counsel: "– 5-4, or anything like that?" Witness: "I don't recall." Counsel: "You might have, but you just don't remember?" Witness: "I might have, but I don't remember." *Id.*

The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

In this instance, where it is so likely that the description of the perpetrator as four feet tall was a transcription error or that Alexander had mis-spoken in reporting to the police, an attempt to go further with it would only have given the witness an opportunity to explain it away, and might have made counsel look petty. At a minimum, the decision not to pursue the point was within the "wide range of reasonable professional assistance" that must be deemed effective. *See id.* at 689 (scrutiny of counsel's performance must be highly deferential; strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance). Counsel's decision to move on was not deficient performance.

Not only does petitioner have to prove that counsel's choices were unreasonable, which he has not, he also must prove that his defense was prejudiced as a result. Where the defendant is challenging his conviction, the appropriate question is "'whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Luna v. Cambra*, 306 F.3d 954, 961 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 695).

Petitioner points out that Alexander and Blackwell were the only two witnesses who identified him, and that a challenge to their credibility might have damaged the case against him, but as noted above, he does not explain what inconsistencies he has in mind, aside from the "four feet tall" statement. Because any further pursuit of that particular point would have been futile, and because petitioner has not identified other inconsistencies, he has

11

1  failed to show a "reasonable probability" that "the result of the proceeding would have been
2  different" had counsel other than as he did.  *Strickland*, 466 U.S. at 694.

3  Petitioner has not shown that his counsel's performance was deficient or that he was
4  prejudiced as to impeachment of the two witnesses.  This claim is without merit.

### 2. Failure to Challenge Warrantless Arrest and Search

Petitioner claims that his counsel ought to have challenged the second of two same-day searches of the Pittsburg residence, a search for which it is not clear whether there was consent.

In order to establish ineffective assistance of counsel based on defense counsel's failure to litigate a Fourth Amendment issue, petitioner must show that: (1) the overlooked motion to suppress would have been meritorious, and (2) there is a reasonable probability that the jury would have reached a different verdict absent the introduction of the unlawful evidence.  *Ortiz-Sandoval v. Clarke*, 323 F.3d 1165, 1170 (9th Cir. 2003) (citing *Kimmelman*, 477 U.S. at 375).  But, failure to file a meritorious suppression motion does not constitute *per se* ineffective assistance of counsel.  *Kimmelman*, 477 U.S. at 384.  "Rather, to satisfy *Strickland*'s performance prong, the habeas petitioner must show that his counsel's failure to file the meritorious motion to suppress 'fell below an objective standard of reasonableness.'"  *Moore v. Czerniak*, 534 F.3d 1128, 1138 (9th Cir. 2008) (finding that counsel's failure to file a motion to suppress a highly damaging unconstitutional confession constituted deficient performance).

Petitioner contends that while it is clear that the owner of the house, Pamela Wells, consented for the police to search while she was there, the record does not indicate that she consented to a second search.  He asserts that defense counsel should have filed a motion to suppress the evidence the police recovered upon reentry.

The record shows that the police initially searched with written permission from Pamela Wells, at 6:35 p.m., and waited until Colbert and petitioner returned at 11:20 p.m. to do the second search.  Ex. B-9 at 302-305.  During the first search the police officers recovered a 9-millimeter assault pistol, .45-caliber ammunition rounds, pictures that

indicated that Greg Colbert was living there, and a set of keys that were later determined to be the victim's. *Id.* at 303-304. During the second search – on which the record is unclear whether or not there was consent – the police officers recovered a .45-caliber semiautomatic pistol and a .357-caliber revolver. *Id.* at 307.

Neither of the guns found during the second search were identified as the murder weapon. One of the guns had been identified as the victim's gun and an inspector determined it was a "matching fit" for the victim's holster. Ex. C-4 at 4. Also, the gun was not found during the first search, and was only recovered during the second search – after petitioner and Colbert entered the house. This does circumstantially implicate petitioner, but it equally implicates Gregory Colbert, and one of the defense theories was that Colbert committed the murder.

The California Court of Appeal describes defendant's complaints at his *Marsden*[1] hearing and some of this claim's background:

> Defendant also complained that counsel failed to object to admission of the guns seized. The trial court responded that a hearing was conducted on the admissibility of guns, during which it concluded that the house was properly searched with the owner's consent. (Marsden 10/17/03 RT 13:14-18) The court mistakenly believed the basis of the hearing was a motion to suppress evidence.
> The record indicates that before trial, the prosecutor filed a motion to introduce the guns seized. Defense counsel filed a written response contending that items recovered in the house were not admissible because defendant was illegally arrested. At the hearing on the motion, during which no witnesses testified, defense counsel reiterated that the guns were seized pursuant to an unlawful arrest, and the prosecutor contended that defendant lacked standing to challenge the search. The prosecutor, defense counsel and the trial court engaged in a lengthy colloquy, during which the prosecutor explained that consent to search had been given by Colbert's ex-girlfriend, who resided in the house. Defense counsel ultimately agreed that the lawfulness of defendant's arrest was irrelevant to the seizure of the guns, which he conceded were recovered during a consent search.

Ex. C-4 at 9 (parenthetical in original).

Petitioner has failed to make the necessary factual showing that the second search was not consensual, which in turn means that he has not shown that a motion to suppress

---

[1] "So named after *People v. Marsden*, 2 Cal. 3d 118 (1970), it is a motion permitting a defendant to articulate why he is dissatisfied with his court-appointed counsel and why counsel should be relieved." *McNeely v. Blanas*, 336 F.3d 822, 825 n. 3 (9th Cir. 2003).

13

would have been successful, and thus has failed to show that counsel's not filing a motion to suppress was deficient representation.

In addition, the case against petitioner was strong, and the gun evidence was not as important as it would have been had it not implicated Colbert as well as petitioner. Most importantly, petitioner was identified by two witnesses as the armed man who ran out of the victim's house after shots were fired. Petitioner's fingerprints were found at the crime scene on both a roll of the tape that had been used to bind the victim and a piece that was stuck to the coffee table. This evidence was so incriminating to petitioner that it is not reasonably probable the result of the proceeding would have been different, even if the evidence from the second search had been suppressed. *Strickland*, 466 U.S. at 694. That is, even if counsel's performance as to this claim was deficient, petitioner was not prejudiced.

There was no Sixth Amendment violation as to this claim.

### 3. Weak Closing Argument

Petitioner's last ineffective assistance of counsel claim is that his counsel presented a weak closing argument. In his traverse, petitioner points to errors that counsel made during his closing statement.

Closing statements include many tactical decisions. A difference of opinion as to trial tactics does not constitute denial of effective assistance, *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984); *see, e.g., Bell v. Cone*, 535 U.S. 635, 701-02 (2002) (not unreasonable for state court to hold decision to waive closing argument in penalty portion of capital case was competent tactical decision, when waiver prevented "very persuasive" prosecutor from arguing); *Weygandt v. Ducharme*, 774 F.2d 1491 (9th Cir. 1985) (failure to object to prosecutor's improper closing remarks falls short of constitutional prejudice when considered within "totality of the evidence").

Petitioner claims that the most significant of counsel's errors was when during his

14

closing statement, in the midst of drawing into question the credibility of the prosecution's witnesses, defense counsel stated, "Now, I don't remember. I'm going to be candid. I do not remember whether they found the [the victim's] keys before or after Colbert and my client showed up. I'm not sure it's terribly critical. If it was before, you know, it's more evidence of what I'm saying, but in any instance, we have the keys." Ex. B-13 at 1030. Petitioner argues it was "absolutely 'critical'" that the keys were found before petitioner arrived, at the home where Colbert – and not petitioner – was staying, especially considering that one of the defense theories was that Colbert committed the murder.

       That the keys were found by the police before the return of Colbert and petitioner was only weak evidence in support of petitioner's theory that Colbert was the killer, given that Colbert and petitioner were "associates," and the memory lapse statement with which petitioner takes issue was a mere five sentences in a closing statement that takes up thirty pages of transcript. *See* Ex. B-13 at 1016-46. Further, as mentioned above, there was a strong case against petitioner. He was identified by two witnesses and his fingerprints were found at the scene of the crime. In addition, the jury was instructed that statements made by attorneys are not evidence. Ex. B-7 at 2. The statement by defense counsel did not prejudice petitioner. *See Strickland*, 466 U.S. at 694.

       Petitioner asserts that counsel mixed up names of witnesses on at least two occasions. Petitioner points out that counsel confused Greg and Ray Blackwell, stating that Greg did something that Ray had done. Ex. B-13 at 1036-1037. Petitioner also points out that petitioner confused Pamela Wells and Gay Walker, at one point stating "Pam Walker" instead of Pamela Wells. *Id.* at 1027; *see also id.* at 1024. While it is not clear whether the errors fell below an "objective standard of reasonableness" under prevailing professional norms, even if they did, they were so tangential to the issue of petitioner's guilt and innocence that there is not a reasonable probability that the result would have been different if counsel had not confused the names. *Strickland*, 466 U.S. at 687-88, 694.

///

15

Petitioner also asserts that counsel mistakenly argued that the victim's wallet had never been processed for fingerprints. Defense counsel's argument as to that point was as follows:

> So we [police] take that wallet, and we put it in a paper bag. We don't dust it for prints there because dusting is not the preferred way to try and lift prints off of leather. Does that mean we don't fume it? Does that mean we don't do any of the dozens of other ways there are to get fingerprints?
> If they had gotten fingerprints off that wallet and it turned out not be [the victim's] – if they get [the victim's], it doesn't really further our knowledge very much. But if it's not [the victim's], it could be very helpful, very helpful to any number of people, my client included.
> And while talking about tests that didn't get run . . . ."

Ex. B-13 at 1032.

The evidence of an Oakland Police Department criminalist was that prints were not recovered from the wallet. Ex. B-10 at 552-54. Although he testified to the methods used to obtain the prints that were found, including "fuming," he did not say what methods were used for the unsuccessful tests of the items of evidence that rendered no prints, a category that includes the wallet. *Id.* at 571. Counsel's argument thus was a rather clever exploitation of this weakness in the evidence. It was not deficient performance to make it.

Lastly, petitioner points out that defense counsel mistakenly stated that Ronald Johnson "was never arrested," when in fact he had been. In fact, what counsel stated was, "Why isn't he arrested? Why aren't – why isn't he sitting next to me and the table is a little more crowded?" *Id.* at 1034. This does not seem to be an error on counsel's part, but rather a way of expressing his opinion that Ronald Johnson should have been a co-defendant in this case. Even if counsel was mistaken, the mistake, like the errors above, too tangential to petitioner's guilt or innocence to have prejudiced him.

The identification evidence and fingerprints were so incriminating to petitioner that even if none of these closing argument errors had occurred and defense counsel had been as credible as possible, petitioner has not shown a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694. There was no Sixth Amendment violation as to this claim.

**C.    Conclusion**

16

1  Because petitioner was not denied effective assistance of counsel in any of the ways
2  he specifies, the rejection of this claim by the California courts could not have been
3  contrary to, or an unreasonable application of, clearly established United States Supreme
4  Court authority.  Habeas relief will be denied as to all ineffective assistance of counsel
5  claims.

## V.  Prosecutorial Misconduct

Finally, petitioner claims that the prosecutor committed misconduct by proceeding with the felony-murder theory and the aiding and abetting theory, and by stating that one of the guns that were found in the Pittsburg residence where petitioner was arrested belonged to the victim, when it was registered to somebody else.

For habeas claims of prosecutorial misconduct, the appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  *Id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).

As pointed out earlier, both the felony-murder theory and the aiding and abetting theory were supported by the evidence, and petitioner had adequate notice of them.  It was not misconduct to try the case on those theories.

In the portion of the petition in which petitioner raises his contention that the prosecutor committed misconduct by stating that one of the guns "belonged" to the victim, petitioner supports his contention by referring to "attached papers."  Pet. at 11.  The only one of the attachments that is relevant is a Victim's Supplemental Property Loss Report from the Los Angeles Police Department, dated September 4, 1999, that lists four guns as having been stolen, one of which is the .45 caliber Kimber pistol that was identified as the

victim's gun. The report does lists the "R/O," which might stand for "registered owner," as "Park, Sam Kyu."

As the court of appeals noted, "Greg identified the .45-caliber pistol as Birden's [victim's] gun. It fit a shoulder holster found in Birden's unit." Ex. C-4 at 4. Whether or not the gun was registered to someone else – not likely, given that it had been stolen – there was testimony that it belonged to the victim, and that testimony adequately supported the prosecutor's remark.

Petitioner's prosecutorial misconduct claim is without merit.

## CONCLUSION

Because petitioner's constitutional rights were not violated in any of the ways he contends, the rejections of these claims by the state appellate courts were not contrary to, or unreasonable applications of, clearly established United States Supreme Court authority. The petition for a writ of habeas corpus is **DENIED**. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: November 20, 2009.

PHYLLIS J. HAMILTON
United States District Judge

P:\PRO-SE\PJH\HC.07\HARVEY229.RUL4.wpd

18